## AFFIDAVIT OF MICHAEL SHINNERS

I, Michael J. Shinners, Task Force Officer with the U.S. Drug Enforcement

Administration ("DEA"), being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I, Michael J. Shinners, am presently employed by the city of Haverhill as a police

officer and have been so for approximately 9 years. I am currently a Detective assigned to the

Drug Enforcement Administration Cross Border Initiative ("DEA/CBI") as a Task Force Officer.

In August 2012, I was assigned to the Detective Division of the Haverhill Police Department,

working as a plain-clothed officer assigned to the narcotics unit. While assigned to the narcotics

unit I conducted physical surveillance and executed court-authorized search warrants, and

utilized other investigative techniques.  I have participated in the execution of search warrants

pertaining to the use, sale, and trafficking of controlled substances, involving cocaine, heroin,

fentanyl, marijuana, and prescription drugs. Between January 2004 and December 2008, while

on active duty in the U.S. Coast Guard, I was assigned as a federal boarding officer and boarded

over 150 vessels.  The boarding team was usually composed of other active duty members as

well as agents from numerous federal, state, and local agencies. The boarding team targeted

illegal activities of vessels in transit of U.S. waterways and often involved transportation of illicit

narcotics.  As a boarding team member, I was trained in the identification and interdiction of

drug activity. I further received approximately 40 hours of training in the identification of

narcotics and the use of narcotics identification kits. During my time as a narcotics detective, I

have participated in the investigation of illegal narcotics, firearms violations, the tracking and

apprehension of fugitives, homicides, violent crimes and property crimes.  During these

investigations I have utilized traditional investigative techniques and conducted investigations

with Special Agents assigned to the Federal Bureau of Investigation, DEA, and Bureau of

Alcohol, Tabaco, Firearms, and Explosives, assistant district attorneys, and various other state

and local police departments.

2.      I graduated the Boston Police Academy in June 2009 and received the Hogan

Award for the highest academic law score. In 2012, I received the Haverhill Police Officer of the

Year award. In December 2013, I completed a Bachelor's Degree in criminal justice at the

University of Massachusetts Lowell campus. In September 2015, I attended an 80-hour training

given by the DEA on narcotics investigations. I have additionally been trained in the cultivation

and management of confidential informants.  I have conducted hundreds of controlled drug

purchases while managing informants and have conducted undercover drug purchases in the

Haverhill and Lawrence areas. During my law enforcement career, I have received specialized

training regarding the activities of narcotics traffickers, including the methods they use to

package, store, and distribute narcotics. I have participated in hundreds of narcotics

investigations involving heroin, fentanyl, cocaine, cocaine base, marijuana, methamphetamine,

oxycodone, and other controlled substances. I personally have participated in all aspects of

narcotics trafficking investigations, including conducting surveillance, using confidential

informants, acting in an undercover capacity, conducting court-authorized interceptions of wire

and electronic communications, and preparing and executing arrest and search warrants.

3.      As a Task Force Officer with the DEA, I am authorized to investigate violations of

the laws of the United States, including violations of the federal drug laws in Title 21 of the United

States Code.  I am a "federal law enforcement officer" as defined by Federal Rule of Criminal

Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and

duly authorized by the Attorney General to request a search warrant.

**PURPOSE OF AFFIDAVIT**

4.      I am submitting this affidavit in support of an application for the issuance of a criminal complaint charging Luis PIMENTEL with distribution of 40 grams or more of fentanyl, a Schedule II controlled substance, in violation of  21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi). I am further submitting this affidavit in support of an application for the issuance of a search warrant authorizing the search of 539 Lowell Street, Apartment 2, Lawrence, Massachusetts 01841 (hereinafter, the "Target Location"). A complete description of the property to be searched is set forth in Attachment A, which is attached hereto and incorporated herein.

5.      As will be explained more fully below, DEA investigators conducted controlled purchases of fentanyl and cocaine from Luis PIMENTEL between May 31, 2018 and July 23, 2018 in North Andover, Massachusetts. Before and after some of the controlled drug purchases, investigators observed PIMENTEL leave and enter his residence at the Target Location.

6.      As a result and as will be discussed below, I submit that there is probable cause to believe that the location to be searched contains records and other evidence of the following offenses:  (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses").  More specifically, as will be discussed below, I submit that there is probable cause to believe that evidence of the Target Offenses, as set forth in Attachment B, will be located at the Target Location, as described in Attachment A.

7.      I have personally participated in the investigation of PIMENTEL since May 2018. I am familiar with the facts and circumstances of this investigation based upon: (a) my personal

knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement officers; and (d) my experience and training as a narcotics investigator.

8.     Because this affidavit is submitted for the limited purpose of establishing probable cause to believe that PIMENTEL distributed 40 grams or more of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi) and that evidence of criminal activity involving the Target Offenses is located at the Target Location, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested criminal complaint and search warrant.  Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested complaint and search warrant.  Nor do I request that this Court rely on any facts not set forth herein in reviewing these applications.

## **PROBABLE CAUSE**

### Undercover Purchase of Fentanyl from Luis PIMENTEL on May 31, 2018

9.     In May 2018, DEA investigators learned from a confidential informant that Luis PIMENTEL was selling fentanyl in the Lawrence area using the phone number (978) 828-1325 (hereinafter, the "1325 Phone.") On May 31, 2018 at 2:19 p.m., DEA investigators working with an undercover police officer (hereinafter, the "UC") utilized an undercover phone to contact PIMENTEL at the 1325 Phone. The UC sent a text message to PIMENTEL ordering "one finger," meaning 10 grams, of fentanyl. All text messages between the UC and PIMENTEL on May 31, 2018 are preserved.  The UC and PIMENTEL agreed to meet at 1600 Osgood Street in North Andover, a large office and manufacturing complex. Prior to meeting PIMENTEL, the UC

4

was equipped with a body-worn audio monitoring and recording device. The audio recording is preserved. The UC was also given $300 of recorded authorized funds to purchase the 10 grams of fentanyl.

10.     At approximately 2:46 p.m., PIMENTEL sent a text message to the UC stating, "On the way." At approximately 2:49 p.m., investigators observed the UC arrive at 1600 Osgood Street in an undercover vehicle. At approximately 3:19 p.m., PIMENTEL sent a text message to the UC stating, "1 min out." Shortly thereafter, investigators observed a heavy set Hispanic male, later identified as Luis PIMENTEL, enter the parking lot of 1600 Osgood Street. Investigators observed PIMENTEL driving a 2010 white Honda Accord, registered to PIMENTEL at the Target Location (hereinafter, the "Honda Accord"). After arriving at 1600 Osgood Street, PIMENTEL exited his vehicle and approached the office building. The UC then got out of the UC's vehicle and approached PIMENTEL outside of 1600 Osgood Street. Outside the building, the UC handed PIMENTEL the $300 of recorded authorized funds and PIMENTEL handed the UC a plastic bag containing compressed white powder wrapped in paper. Based upon my training and experience, the appearance and packaging of the white powder, and the purchase price, I believe the white powder is fentanyl. Additionally, as discussed further below, drugs received from PIMENTEL on June 20, 2018 were confirmed through laboratory analysis to be fentanyl. The appearance, packaging, and pricing of all suspected fentanyl received from PIMENTEL were consistent throughout this investigation. After the transaction, the UC and PIMENTEL parted ways into their respective vehicles. Investigators followed the UC to a pre-determined location and the UC handed investigators the bag of suspected fentanyl, which was secured. The suspected fentanyl was not field tested due to the airborne hazards of fentanyl to

officer safety. The 10 grams of suspected fentanyl was transported to the DEA Northeast

Regional Laboratory and is currently pending analysis.

<u>Undercover Purchase of Fentanyl from PIMENTEL on June 7, 2018</u>

11.     On June 7, 2018, at approximately 11:27 a.m., the UC contacted PIMENTEL by

sending a text message to the 1325 Phone ordering "5," meaning 5 "fingers" or 50 grams, of

fentanyl. In subsequent text messages with PIMENTEL, the UC clarified that the UC was

ordering "5 fingers" of fentanyl for $250 per "finger." The UC also sent a text message ordering

"one ball," which is a street term meaning 3.5 grams of cocaine. The UC and PIMENTEL again

agreed to meet at 1600 Osgood Street. All text messages between the UC and PIMENTEL on

June 7, 2018 are preserved. Prior to meeting PIMENTEL, the UC was equipped with an audio

monitoring and recording device. The audio recording is preserved. The UC was also provided

$1,400 of recorded authorized funds to purchase the fentanyl and cocaine.

12.     Earlier that day, at approximately 11:15 a.m., investigators conducted surveillance

in the area of the Target Location. The Target Location, specifically apartment 2, is

PIMENTEL's registered address with the Massachusetts Registry of Motor Vehicles. According

to public records, 539 Lowell Street, Lawrence, Massachusetts is a two-unit residence.

Investigators also confirmed through PIMENTEL's driver's license image that he was the same

heavy set Hispanic male that met the UC on May 31, 2018. At the Target Location, investigators

observed in the driveway the same Honda Accord that PIMENTEL drove to meet the UC on

May 31, 2018.

13.     At approximately 12:39 p.m., investigators observed PIMENTEL exit the Target

Location and enter the driver's seat of a white Ford Econoline Van (hereinafter, the "Econoline

Van"). Investigators then observed PIMENTEL drive to an Advanced Auto located at 183

Broadway in Lawrence. PIMENTEL went into the Advanced Auto for several minutes and then returned to the van and drove to 1600 Osgood Street.

14.     At approximately 12:57 p.m., PIMENTEL sent a text message to the UC stating, "3 min away." At approximately 1:05 p.m., investigators observed PIMENTEL enter the parking lot of 1600 Osgood Street where the UC was waiting for PIMENTEL. The UC and PIMENTEL exited their respective vehicles and met outside the building at 1600 Osgood Street. An investigator took photographs of the UC and PIMENTEL meeting outside of the building. These photographs are preserved. The UC handed PIMENTEL $1,400 of recorded authorized funds and PIMENTEL handed the UC a plastic bag containing five packages of compressed white powder wrapped in paper. Based upon my training and experience, the appearance and packaging of the white powder, and the purchase price, I believe the white powder is fentanyl. PIMENTEL also handed the UC a smaller plastic bag containing a loose white powder. Based on my training and experience, I believe the loose white powder is cocaine. After the transaction, the UC and PIMENTEL returned to their respective vehicles and left the area. Investigators followed the UC to a pre-determined location where the UC relinquished control of the suspected fentanyl and cocaine and the drugs were secured. The drugs were later transported to the Northeast Regional Laboratory and are pending analysis.

15.     Meanwhile, other investigators maintained surveillance of PIMENTEL as he entered a 7-Eleven convenience store in Bradford, Massachusetts, approximately 8 minutes after departing from the UC. After leaving the 7-Eleven store, PIMENTEL drove to Oxford Street in Haverhill, Massachusetts. Once on Oxford Street, PIMENTEL parked and exited his van. On Oxford Street, he met with an unidentified female that was wearing a badge from Oxford Manor, a nursing home on Oxford Street. They exchanged a small item and then PIMENTEL entered the

driver's seat of a green Nissan Altima. PIMENTEL drove the Altima to a car wash, where he

parked in one of the covered car wash bays. Once parked in the bay, PIMENTEL exited the

vehicle and lifted the hood to the engine compartment. Investigators observed PIMENTEL

remain near the engine compartment of the vehicle, but he did not wash the vehicle. After

closing the hood, PIMENTEL went directly back to Oxford Street and parked the vehicle in a

parking lot across the street from Oxford Manor. PIMENTEL exited the Altima and returned to

the van, which was still parked on Oxford Street.

16.     Investigators maintained surveillance of PIMENTEL as he drove the van

southbound towards Lawrence. Investigators later observed PIMENTEL back into the driveway

between 17-23 Winthrop Avenue in Lawrence. Once in the driveway, PIMENTEL opened the

rear of the van and met with several unidentified males who were in the driveway. Due to the

van and the narrow driveway, this meeting was out of view of the surveillance units. After

approximately 11 minutes, PIMENTEL closed the rear of the van and entered the driver's seat.

Several minutes later, two to three unidentified males entered the van. Investigators maintained

surveillance of the van until they lost visual contact of it near the intersection of Route 28 and

Interstate 495 in Lawrence. At approximately 3:00 p.m., surveillance was terminated.

### Undercover Purchase of Fentanyl from PIMENTEL on June 20, 2018

17.     On June 20, 2018, at approximately 1:01 p.m., the UC contacted PIMENTEL by

sending a text message to the 1325 Phone and ordered 5 "fingers," meaning 50 grams, of

fentanyl. The UC and PIMENTEL again agreed to meet at 1600 Osgood Street. All text

messages between the UC and PIMENTEL on June 20, 2018 are preserved. Prior to meeting

PIMENTEL, the UC was equipped with an audio monitoring and recording device. The audio

recording is preserved. The UC was also provided $1,250 of recorded authorized funds to purchase the fentanyl.

18.     Earlier that day, at approximately 1:00 p.m., investigators conducted surveillance in the area of the Target Location. Investigators observed the Honda Accord and the Econoline Van parked in front of the Target Location.

19.     At approximately 1:25 p.m., after the UC ordered fentanyl from PIMENTEL, an investigator observed PIMENTEL exit the Target Location and enter the van. Investigators maintained surveillance of PIMENTEL and the van as it travelled directly to 1600 Osgood Street. At approximately 1:41 p.m., the UC received a text message from PIMENTEL that stated, "How far." The UC replied, "About two exits away." At approximately 1:46 p.m., investigators observed PIMENTEL drive into the parking lot of 1600 Osgood Street and park in the lot. At approximately 1:51 p.m., the UC arrived in the parking lot of 1600 Osgood Street. A few minutes later, PIMENTEL exited the van and stood in front of it. At approximately 1:59 p.m., the UC met with PIMENTEL at the front of the van. The UC handed PIMENTEL $1,250 of recorded authorized funds and PIMENTEL handed the UC a plastic bag containing five packages of compressed white powder wrapped in paper. Based upon my training and experience, the appearance and packaging of the white powder, and the purchase price, I believe the white powder is fentanyl. After the exchange, the UC and PIMENTEL parted ways and both drove towards Interstate 495. Investigators followed the UC to a pre-determined location where the UC relinquished control of the suspected fentanyl. The five packages of suspected fentanyl were later transported to the Northeast Regional Laboratory for analysis and determined to contain 50.305 grams of fentanyl.

Undercover Purchase of Fentanyl from Luis PIMENTEL on July 23, 2018

20.     On July 23, 2018, at approximately 11:18 a.m., the UC contacted PIMENTEL by sending a text message to the 1325 Phone and ordered 5 "fingers," meaning 50 grams, of fentanyl. The UC and PIMENTEL again agreed to meet at 1600 Osgood Street. All text messages between the UC and PIMENTEL on July 23, 2018 are preserved. Prior to meeting PIMENTEL, the UC was equipped with an audio monitoring and recording device. The audio recording is preserved. The UC was also provided $1,250 of recorded authorized funds to purchase the fentanyl.

21.     Earlier that day, at approximately 11:21 a.m.., investigators conducted surveillance in the area of the Target Location. Investigators observed the Honda Accord parked in the driveway of the Target Location. At approximately 11:26 a.m., I observed the Econoline Van arrive at the Target Location. An unidentified male wearing a blue shirt and jeans exited the van and entered the Target Location. At approximately 11:36 a.m., another unidentified male, wearing a black t-shirt and tan pants, arrived at the Target Location in a black Lincoln Town Car and went onto the front porch of the Target Location holding a white bag in his hand. After standing on the porch and waiting for a moment, he returned to stand outside the Town Car. Investigators previously observed that the Target Location has two side doors on the right side of the house, as depicted in Attachment A. Minutes later, a male opened the side door furthest to the right and closest to the rear of the house. Then, the unidentified male from the Town Car entered the Target Location from that same door. It should be noted that during the course of this investigation, investigators have not made any observations which indicate that anyone other than PIMENTEL resides at the Target Location.

22.     At approximately 11:47 a.m., PIMENTEL sent a text message to the UC that stated, "Getting it ready." The UC responded at approximately 12:14 p.m. that the UC was 10 minutes away from the meeting location.

23.     At approximately 12:19 p.m., an investigator observed PIMENTEL exit the Target Location and drive away in the Econoline Van. Investigators maintained surveillance of the van as it traveled in the direction of 1600 Osgood Street. At approximately 12:34 p.m., PIMENTEL drove into the McGovern Transportation Center in Lawrence. Within one minute, the van left the Transportation Center with a male now in the passenger seat. PIMENTEL drove the van approximately two blocks and let out the male passenger at a pizza shop. Some investigators maintained surveillance of the male passenger and approached him inside the bathroom of the pizza shop. Upon a pat frisk, an investigator felt an object inside the male passenger's pants. The male passenger stated that the object was "heroin." The investigator retrieved the object, which is a small, clear, knotted, plastic bag containing an off-white powdery substance. Based upon my training and experience and packaging, the off-white powdery substance is consistent with being heroin or fentanyl.

24.     At approximately 12:34 p.m., PIMENTEL arrived at 1600 Osgood Street. The UC was already in the parking lot of 1600 Osgood Street and the UC approached PIMENTEL's van after it arrived. The UC entered the passenger seat of PIMENTEL's van and handed PIMENTEL $1,250 of recorded authorized funds and PIMENTEL handed the UC a plastic bag containing five packages of compressed white powder wrapped in paper. Based upon my training and experience, the appearance and packaging of the white powder, and the purchase price, I believe the white powder is fentanyl. Within one minute, the UC exited PIMENTEL's van and returned to the UC vehicle. Both PIMENTEL and the UC drove out of the parking lot of 1600 Osgood

Street. Investigators followed the UC to a pre-determined location where the UC relinquished control of the suspected fentanyl and the drugs were secured. The drugs were later transported to the Northeast Regional Laboratory and are pending analysis.

25.     Investigators maintained surveillance of PIMENTEL as he met with an unidentified male on Garfield Street in Lawrence. At approximately 1:14 p.m., PIMENTEL went into Tower Hill Mart in Lawrence for approximately 2 minutes and then drove back to the Target Location. PIMENTEL stayed on the porch of the Target Location using his cellular telephone for a few moments. Investigators then observed PIMENTEL enter the Target Location using the side door furthest to the right and closest to the rear of the house. This is the same door that the unidentified male entered as discussed in paragraph 21. Thereafter, surveillance was terminated.

### Drug Traffickers' Use of Residences and Cell Phones Generally

26.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and locations of operation:

a.     Illegal controlled substances.

b.     Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.     Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.      Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.      Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

27.     Based upon my training and experience, as well as the training and experience of other law enforcement officers I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid

and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

28.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence. Such documents include rental or storage property agreements and receipts.

29.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

30.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their

illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

31.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

32.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

33.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many

documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

34.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

35.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A

wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

36.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information

provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

37.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

38.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of cellular telephones, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

    a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

39.     Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment B, will be found in the Target Location.

## CONCLUSION

40.     Based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that on June 20, 2018, Luis PIMENTEL distributed 40 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi).  Accordingly, I respectfully request that a criminal complaint charging PIMENTEL with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi) be issued.

41.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that PIMENTEL resides at the Target Location and that at the Target Location, as described in Attachment A, there exist evidence, fruits, and instrumentalities of PIMENTEL's drug distribution activities as set forth in

Attachment B.  Accordingly, I respectfully request that a search warrant be issued for the search of the property described in Attachment A for the items detailed in Attachment B.

42.     Disclosure of the contents of the applications, affidavit, complaint, and search warrant could compromise and jeopardize the ongoing investigation.  For that reason, I request that the application, affidavit, complaint and search warrant be sealed until further order of the Court.

_____
Michael Shinners
Task Force Officer
Drug Enforcement Administration


SIGNED and SWORN TO before me on August 10, 2018.

HONORABLE DAVID H. HENNESSY
Chief United States Magistrate Judge
District of Massachusetts

## ATTACHMENT A

**539 LOWELL STREET, APARTMENT 2, LAWRENCE, MASSACHUSETTS 01841**

The premises at 539 Lowell Street in Lawrence is a two-unit residence.  It has green wood siding with white trim.  The numbers 539 are displayed to the right of the front door in black lettering. Apartment 2 is accessible through the side door furthest to the right and closest to the rear of the house, which is notated in Figure 2 below with a red circle. Photographs of the house are attached.



Figure 1: Front of 539 Lowell Street

Figure 2: Right side of 539 Lowell Street
Front of the house is to the left side of the photograph

## ATTACHMENT B

### (Items to be Seized from Property)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses"):

1. Illegal controlled substances, including but not limited to, fentanyl and cocaine.

2. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

3. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

5. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

6. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7.     Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

8.     Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

9.     Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

10.    Cellular telephones, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

     a.     Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

     b.     Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

     c.     Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

     d.     Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

     e.     GPS data;

     f.     Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

     g.     Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.